UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAY D. KNOX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 1:11-cv-00949-TWP-TAB |
| | ) | |
| MICHAEL L. SNIDER, and | ) | |
| THE SNIDER GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

## II.   STATEMENT OF MATERIAL FACTS IN DISPUTE

In order to respond to Defendants' offered Statements of Fact and in order to cite the

Defendants' Statements of Fact, Plaintiff has numbered consecutively each of the Defendants'

Statements of Facts in the Defendants' Brief. Plaintiff has added responses to those Defendants'

Statements of Facts that Plaintiff disputes.

A.   **Plaintiff's Alcoholism**

1.      Plaintiff testified that he began drinking alcohol when he was eighteen years old.  (Knox

Dep., pp. 29-30).

2.      He was arrested in 1991 for a DUI.  (Knox Dep., p. 19).

3.      Following his first DUI, Plaintiff was sober for eight months before receiving a second DUI

in 1992 at which time he wrecked a 1991 S-10 he was driving.  (Knox Dep., pp. 19, 30, 112).

4.      He pled not guilty and on both occasions was convicted following a bench trial.  (Knox Dep., pp. 19-20).

5.      Following his second DUI, Plaintiff underwent treatment for alcohol abuse and claims to have remained sober for seven years until roughly 1999.  (Knox Dep., pp. 26, 31).

6.      Plaintiff continued to drink from 1999 to 2004, when he claims to have entered a four or five year period of sobriety.  (Knox Dep., pp. 31-32).

7.      Plaintiff was divorced in 2007 and pursuant to the Decree of Dissolution of Marriage Plaintiff was required to purchase an alcohol breath sensor for his wife so that she could administer alcohol breath tests prior to Plaintiff receiving visitation with his kids.  (Knox Dep., p. 98).

8.      The divorce decree further prohibits Plaintiff from driving any vehicle in which any of his children are passengers.  (Knox Dep., pp. 98-99).

9.      Plaintiff admits that he began drinking again in 2008.

10.     Following an incident at a Snider Group jobsite on June 26, 2008, Plaintiff agreed to receive treatment for alcohol abuse.  (Knox Dep., p. 26).

11.     Plaintiff was seen on an outpatient basis at St. Vincent beginning on July 2, 2008, at which time he reported that he drank two and a half gallons of whiskey in the previous three weeks.  (Knox Dep., p. 65).

12.     Plaintiff abandoned his job with the Snider Group in August 2009.  (Knox Dep., p. 35).

**RESPONSE:** Disputed. Plaintiff had a preliminary offer of employment from TMC. Plaintiff called Mike Snider on August 12, 2009 and notified him that Plaintiff quit. Knox Dep. 105:9-19; Def. Fact 48. In spite of Plaintiff's resignation, The Snider Group sent Plaintiff a letter dated August 19, 2009 stating that he had not been at work for five days  nor had Plaintiff offered a satisfactory explanation. Def. Ex. 2, Knox Dep. Ex. 15. The Snider Group letter of termination backdated his termination and stated that he was terminated as of 8/10/09, which was only the first day that Plaintiff did not work after Friday, August 16, 2009. *Id.*

13.     Plaintiff described his alcohol consumption following his job abandonment as sporadic due to his finances, but testified that he drank "whenever I had a chance basically." (Knox Dep., p. 35).

**RESPONSE:** Plaintiff did not abandon his job, which is described above.

14.     Plaintiff testified that he last drank alcohol four weeks prior to his May 18, 2010 deposition and admitted that he was consistently drinking from August 2009 through April 2010. (Knox Dep., pp. 35, 37-38).

**B.     The Snider Group's Support of Plaintiff Through his DUI's**

15.     After Plaintiff received his second DUI in less than two years, J.S. Snider ("Steve Snider") authored a letter on behalf of Plaintiff requesting a lenient sentence.

16.     Steve Snider wrote that Plaintiff:

> …is one of our success stories…and we are seeing some great strides in his level of responsibility and his ability to assume some role in leadership.  I know he has made a serious mistake and truly think this will be a growth experience for him.  I believe him when he says it will never happen again.  [Plaintiff] never misses a day of work and claims to have learned his lesson so I respectfully suggest leniency

3

in his sentence and save the harsher dealings for people who aren't
trying to make something of themselves.

(Knox Dep., p. 94; Ex. E).

**C.**   **The Snider Group's Support of Plaintiff Through his Divorce**

17.    Plaintiff was divorced in 2007.  (Knox Dep., p. 32).

18.    The divorce was particularly nasty with Plaintiff's wife alleging that Plaintiff molested one

of his own daughters.  (Knox Dep., pp. 21, 33).

19.    Although Plaintiff was arrested for child molestation, the charges were later dismissed.

(Knox Dep., p. 21).

20.    During his divorce, Michael Snider wrote a letter on behalf of Plaintiff stating that:

> [Plaintiff] has been an employee of The Snider Group, Inc. for nearly
> 20 years.  Over the years I've gotten to know [Plaintiff] very well and
> find him to be a reliable and trustworthy employee.  He is a caring
> and compassionate person and we are very glad to have him as an
> employee. [Plaintiff] has made great improvements over the past few
> years both in his professional duties and his personal life from what
> we see.  His love of his children is evident in his comments and
> stories and while his situation is unfortunate I see him as a good
> person and loving father.  I hope that what we see every day for many
> hours is taken into consideration as to the quality of person and father
> [Plaintiff] strives to be.

(Knox Dep., p. 110; Ex. H).

21.    Additionally, on November 26, 2007, August Koch appeared in court and testified on behalf

of Plaintiff.  (Koch Dep., Ex. 3).

22.    Mr. Koch described Plaintiff as "dependable," as someone Mr. Koch could "count on to

help…guide the younger people."  (Koch Dep., Ex. 3, p. 4).

23.     Mr. Koch further testified that during the six years that he had supervised Plaintiff he had no reason to believe that he was consuming alcohol while working on his crew.  (Koch Dep., Ex. 3, p. 10).

**D.     Plaintiff Retains his Employment After Admitting to Drinking on the Lost Run Farms Jobsite**

24.     In the 2003 to 2005 time frame, Mike Snider received a report that Plaintiff might have an alcohol problem.  (Snider Dep., p. 50).

25.     Mike Snider came to the jobsite and spoke with Plaintiff who admitted that he had been drinking heavily and was in no condition to be on the job.  (Snider Dep., p. 50).

26.     Mike Snider suggested that Plaintiff get some help and that he would not be allowed to return to work until he had done so.  (Snider Dep., p. 50).

27.     Plaintiff was allowed to return to work after showing Mike Snider a prescription for Antabuse.  (Snider Dep., p. 51).

28.     Plaintiff has no recollection of this incident.  (Knox Dep., pp. 45-46).

29.     Plaintiff was divorced in 2007.  (Knox Dep., p. 32).

**E.     Plaintiff Retains his Employment After Admitting to Drinking on the Town to Ditch Project**

30.     On June 26, 2008, Mike Snider received a call from Mr. Koch indicating that Plaintiff was acting abnormally.  (Snider Dep., pp. 53-54).

31.     When Mr. Snider arrived at the jobsite he demanded that Plaintiff remove his sunglasses. (Snider Dep., p. 54).

32.    When he did, his eyes were observed to be bloodshot and his speech was slurred.  (Snider Dep., p. 54).

33.    Plaintiff admitted that he had been drinking the night before.  (Snider Dep., p. 54).

34.    Mike Snider informed Plaintiff that he wanted him to submit to a breath test and Plaintiff replied that he would rather quit.  (Snider Dep., p. 54).

**RESPONSE:** Disputed. Mike Snider did not say anything about a breath test on that day. Knox Dep. 54:15-57:7. Mike Snider never asked Plaintiff to take a breath test on a job site. *Id.* On other occasions, when employees had been drinking at the office after work, Mike Snider asked the employees to take a breathalyzer test to see if they were able to drive. Knox 54:15-55:56:19. Plaintiff did not refuse and gave a breath test to Mike Snider. *Id.* On June 26, 2008, Mike Snider did not request a breath test of Plaintiff, and instead, allowed Plaintiff to drive home alone. *Id.* Plaintiff offered his heavy equipment keys to Mike Snider, but Snider told him to keep the keys and go home and think about it. Snider did keep Plaintiff's Snider Group card. Mike Snider had been a deputy sheriff for years, and if he had ordered Plaintiff to take a breath test and Plaintiff had refused, Snider would not have allowed Plaintiff to drive home. Snider did not order Plaintiff to take a breath test. Instead, Snider asked Plaintiff to go to rehabilitation, which Plaintiff did and completed a rehabilitation program. Knox Dep. 63:1-20; Snider Dep. 50:16-25. Plaintiff had previously completed a rehabilitation course as well. *Id.* Part of rehabilitation courses are testing. Plaintiff never refused to take a rehabilitation course or a test. Snider did not say anything about a test on that day. Instead, Snider told Plaintiff to go home and think about it and come back Monday. Plaintiff followed Snider's instructions, came back Monday, went to a rehabilitation course, Snider allowed him to continue to work, and Plaintiff successfully completed the rehabilitation course. Knox Dep.

63:1-20. If Plaintiff had refused to take a breath test, Snider would not have told him to come back

after he thought about quitting and would not have allowed Plaintiff to continue working for Snider.

35.     Mike Snider then offered to take Plaintiff to a testing facility and Plaintiff refused.  (Snider

Dep., p. 54).

**RESPONSE:** Disputed for the same reasons stated above. Snider did not say anything about a test

on that day to Plaintiff. Instead, Snider told Plaintiff to go home and think about it and come back

Monday. Plaintiff followed Snider's instructions, came back Monday, went to a rehabilitation

course, Snider allowed him to continue to work, and Plaintiff successfully completed the

rehabilitation course. Knox Dep. 63:1-20; Koch Dep. 67:19.

36.     Plaintiff handed in his company ID and keys and left the jobsite.  (Snider Dep., pp. 54-55).

**RESPONSE:** Plaintiff offered his company ID and heavy machinery keys to Snider. Snider kept

the company ID, but he told Plaintiff to keep the keys, think about it, and come back Monday. Knox

Dep. 51:1-52:2.

37.     Mike Snider told Plaintiff to come back and talk to him when he was sober.  (Snider Dep.,

p. 55).

**RESPONSE:** It is admitted that Mike Snider told Plaintiff to go home and come back to talk to him.

Knox Dep. 46:16-58:7. It is disputed that Snider said when you are sober. *Id.* Plaintiff complained

to Snider about his supervisor Augie Koch harassing Plaintiff and calling Plaintiff dumb ass. Knox

Dep. 46:16-58:7. Plaintiff was very upset with his supervisor and offered to quit. Snider told him

to go home and come back Monday morning. *Id.*

38.     Following this incident, Mr. Snider dictated a memo to be placed in Plaintiff's personnel file

that provided:

> [Plaintiff] quit this morning at 9:00 a.m. after being suspected of having alcohol on his breath. [He] was asked to submit to a drug test at which time he opted to quit rather than take [the] test.
>
> Per Mike Snider, [Plaintiff] is not employed as of 9:00 a.m. this morning. However, Mike advised [Plaintiff] that he had until Monday morning June 30th, 2008 to determine if he still wanted to be employed. [Plaintiff] would need to be actively participating in an alcohol rehab program and provide proof that he has stayed clean.

(Snider Dep., p. 72; Ex. 4).

**RESPONSE:** It is unknown when Snider made up this memo. It has no precedent or logical explanation. Even this memo that was prepared at some unknown time does not claim that Plaintiff refused to take a test. There is no claim that any test was a DOT regulated test. There is no claim that anyone showed such a memo to Plaintiff or talked to him about it. There is no claim that anyone claimed that Plaintiff had a DOT violation.

39.     The following Monday, Plaintiff met with Mike Snider and Dan Shotts (the Snider Group's other VP). (Snider Dep., p. 68).

40.     The three of them discussed Plaintiff's alcoholism and the Snider Group offered to help him in any way possible and to try to keep his career on track. (Snider Dep., p. 68).

41.     Plaintiff was seen on an outpatient basis at St. Vincent beginning on July 2, 2008, at which time he reported that he drank two and a half gallons of whiskey in the previous three weeks. (Knox Dep., p. 65).

42.     On or about July 14, 2008, Plaintiff presented the Snider Group with doctor's note from St. Vincent indicating that he was still in the treatment program, but was released to return to work as of July 14, 2008. (Snider Dep., p. 74, Ex. 10).

43.     Plaintiff was allowed to resume his employment with the Snider Group and even received a bonus at the end of 2008 in the amount of $1,840.00.  (Snider Dep., p. 76, Ex. 11).

44.     Although Plaintiff recalls Mr. Snider being called to the Town to Ditch Project on June 26, 2008, and acknowledges that he underwent alcohol treatment starting on July 2, 2008, he has no recollection of being suspected of drinking on the job or of Mr. Snider asking him to submit to a breath test.  (Knox Dep., pp. 46, 54).

**RESPONSE:** It is disputed that it is a failure of Plaintiff to recall. Plaintiff testified that Mike Snider did not ask him to take a breath test on that day. Knox Dep. 46:16-58:7. Plaintiff was upset with harassment by his supervisor Augie Koch. Mike Snider told Plaintiff to go home for three or four days and come back Monday. Plaintiff followed Snider's instructions. *Id.*

45.     Although he denies drinking on the job on June 26, 2008, he admits that he was drinking whiskey the night before.  (Knox Dep., p. 65).

46.     He acknowledges meeting with Mr. Snider and Dan Shotts the following Monday and discussing his drinking, and states, "It was a mutual discussion on the alcohol problem.  It was mutual between me, [Mike Snider], and Dan Shotts.  I went to St. Vincent's.  I did go to St. Vincent's, but I did that on my own."  (Knox Dep., pp. 59, 61).

**F.     Plaintiff Abandons his Job at the Snider Group**

47.     Plaintiff admits that he failed to show up for work at the Snider Group from August 10 through August 15, 2009.  (Knox Dep., p. 68).

**RESPONSE:** Disputed. Plaintiff was absent from April 10, 2012 to August 12, 2009, when he telephoned Mike Snider and told Snider that he quit. Def. Fact 49. Snider did not record his resignation, but instead, claimed that Plaintiff failed to show up through August 15, 2009, and then

on August 19, 2009 sent Plaintiff a letter of termination for not being at work or giving a satisfactory

explanation through August 15, 2009, which was a false statement by Snider. Snider was mad at

Plaintiff and back-dated the effective date of the termination to August 10, 2009, even though

Plaintiff quit August 12, 2009 and even though Snider claimed that Plaintiff missed work until

August 15, 2009. Def. Ex. 2, Snider Dep. Ex. 15.

48.     Although he did not bother to inform anyone at the Snider Group that he was quitting,

Plaintiff was adamant during his deposition that he was not terminated by the Snider Group:

> A:     I quit.  I wasn't terminated.
> Q:     When is it that you maintain that you quit?
> A:     I just quit.  I never told anybody.
> Q:     You just quit without telling anybody?
> A:     Yes, sir.
> Q:     So when you stopped showing up to work, in your
>        mind you had quit your job?
> A:     Yes, sir.
> Q:     When you didn't show up to work on August 10, had
>        you already made up in your mind that you were
>        leaving the Snider Group?
> A:     Yes, sir.
> Q:     So in your mind, you had already quit as of August
>        10?
> A:     Yes, sir.
> Q:     Even though at that point you hadn't told anybody at
>        the Snider Group?
> A:     Yes, sir.

(Knox Dep., p. 71).

**RESPONSE:** Plaintiff was not terminated when he called Mike Snider on August 12, 2009 and quit.

Def. Fact. 49.

49.     After being absent for three days, Plaintiff placed a three minute phone call to Mike Snider

on August 12, 2009 and informed him that he quit.  (Knox Dep., pp. 104-105, Ex. F).

**RESPONSE:** Not disputed.

50.     On August 19, 2009, the Snider Group sent Plaintiff a correspondence indicating that he was

terminated as of August 10, 2009 for job abandonment.  (Snider Dep., Ex 15).

**RESPONSE:** Not disputed that the Snider Group sent Plaintiff such a letter, even though Plaintiff

had quit.

G.      Plaintiff Applies for Employment with TMC Transportation

51.     Plaintiff claims that he stopped showing up to work at The Snider Group because he had

applied for a job with TMC Transportation as an over the road truck driver and was "taking care of

stuff [TMC] wanted me to take care of." (Knox Dep., p. 68).

52.     Plaintiff claims that TMC made him a specific offer of employment and scheduled him to

receive on-the-job training with another driver since he did not have previous over-the-road

experience.  (Knox Dep., p. 75).

53.     Plaintiff claims that his employment was then rejected after TMC received an employment

verification form from the Snider Group.  (Knox Dep., pp. 77-78).

54.     The employment verification was completed by Mike Snider on September 9, 2009 and

contained a series of six questions related to drug and alcohol testing.  (Knox Dep., p. 81, Ex. D).

55.     Plaintiff claims that Mr. Snider's affirmative answer to the question "Did this employee

refuse to be test[sic]?" was inaccurate.  (Knox Dep., pp. 82-83, Ex. D).

**RESPONSE:** Plaintiff claims that it is not only not true, it was discriminatory, retaliatory, and

defamatory. Pl. Second Am. Complaint, Dkt. Nos. 16-1, 22. Plaintiff also claims that he quit, and

that he was not terminated, until the Defendants maliciously terminated him after he quit and told

TMC that he was terminated, instead of saying that he was not terminated. Knox Dep. 71:5-20,

104:3-105:15; Knox Dep. Ex. D. Plaintiff also claims that in conjunction with the Defendants stating

that Plaintiff refused DOT related testing, the Defendants falsely stated that Plaintiff did not

complete the return-to-duty process. Knox Dep. Ex. D; Snider Dep. 74:15-76:17, 50:22-25, 90:15-

92:5. The Defendants' statements were all discriminatory, harassing, retaliatory, and defamatory.

56.     Plaintiff also claims that his hire date with The Snider Group on the employment verification

was incorrect as it listed his rehire date of May 25, 1990, rather than his original hire date, but

acknowledges that he has no reason to believe that TMC Transportation refused to hire him because

his hire date was identified as May 25, 1990.  (Knox Dep., p. 83).

### III.   LEGAL ARGUMENT

#### A.   There are acts within 300 days of the charge of discrimination.

The Defendants' Brief argues that Plaintiff quitting his job on August 10, 2009 was the

"sole incident that occurred within 300 days of the filing of the Charge of Discrimination." Def.

Br. p. 10:2-4. The Defendants' statement that this was the sole incident is not true.

On August 12, 2009, Plaintiff notified the Defendants that he quit. Def. Fact 49; Knox

Dep. 104-105. In spite of Plaintiff notifying the Defendants on August 12, 2009 that he quit, the

Defendants sent Plaintiff a letter dated August 19 stating that Plaintiff was terminated for job

abandonment because he was absent August 10 through August 15. Snider Dep. Ex. 15. The

Defendants also backdated his termination to August 10, 2009. *Id.*

On September 9, 2009, the Defendants then told TMC that Plaintiff was terminated,

instead of stating that he was not terminated, because he quit. Def. Ex. 1, Knox Dep. Ex. D. On

the same date, the Defendants went further to defame Plaintiff in his occupation by falsely

stating that Plaintiff refused DOT regulated testing. *Id.* In order to make credible the Defendants'

statement that Plaintiff refused DOT regulated testing, the Defendants also falsely stated that Plaintiff did not complete the return-to-duty process. *Id.* Each of those statements was discriminatory harassment, retaliatory, and defamatory, and they were made within 300 days the EEOC Charge of Discrimination filed May 26, 2010. Def. Designation of Evidence 5.

Those statements continued the discriminatory harassment, and retaliation against Plaintiff that Plaintiff had endured for the years of employment with the Defendants that are set forth in the Defendants' Statements of Fact. The Defendants simply ignore these facts, which is improper on a motion for summary judgment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146, 150-153 (2000); *Byrd v. Illinois Dept. of Public Health*, 423 F.3d 696, 712 (7th Cir. 2005); *Harvey v. Office of Banks and Real Estate*, 377 F.3d 968, 707 (7th Cir. 2004).

      B.    <u>There is evidence of a prima facie case for disability discrimination.</u>

The Defendants argue that Plaintiff must use either a direct method or an indirect method of proof, but that is not true.

The Supreme court decision of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973) merely held that discrimination cases, like most other cases, did not need to be proved by direct evidence, which is considered to be admissions. Discrimination could be proved, like most other cases, by circumstantial evidence. The Court set out four factors that could be considered to prove a *prima facie* case of discrimination. Those four factors were not rigid or required factors, but rather, one set of factors of circumstantial evidence to prove a *prima facie* case of discrimination. The Court called the four factors an indirect method of proof, as opposed to a direct method using direct evidence.

Later, some courts treated the four factors, not as *permissible* factors to be considered

13

to prove a *prima facie* case, but rather, as *required* factors for a *prima facie* case of discrimination under the indirect method. The Supreme Court has consistently stated that the four factors are not a rigid standard and are not required factors, only one set of many circumstances to be considered. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100 (2003); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)(citing previous Court decisions).

To further confuse the matter, some courts described the direct method as including both direct and circumstantial evidence. Courts later acknowledged that those descriptions were "confusing" and "somewhat misleading." *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007); *Helmsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007).

More recent decisions make clear that plaintiffs may rely on direct or circumstantial evidence *or both direct and circumstantial evidence together. Lewis v. School Dist. #70*, 523 F.3d 730, 742 (7th Cir. 2008); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004).

The Seventh Circuit has noted that direct and indirect methods are "snarls and knots that the current methodologies used in discrimination cases of all kinds have inflicted on courts and litigants alike." *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012)(Wood concurring joined by Tinder and Hamilton). The opinion stated "that the time has come to collapse all these tests into one" as has been done in the trial stage, and restore needed flexibility to the pre-trial stage. *Id.*

The parties and the Court must consider all of the evidence in the record. *Reeves, supra.* The parties and the Court cannot segregate the evidence into separate compartments. *Coleman, supra; Lewis, supra; Wyninger, supra.*

14

1.    <u>There is evidence that Plaintiff had a disability.</u>

Alcoholism has long been recognized as a disability. *Raytheon v. Hernandez*, 540 U.S.

44, 47-50 (2003)(not disputed that recovering alcoholic and drug user was disabled); ( *Minors v.*

*Cargil Communications, Inc.*, 113 F.3d 820, 823-824 (8th Cir. 1997); *Crewe v. United States*

*Office of Personnel Management*, 834 F.3d 140, 141 (8th cir. 1987). In case law under the ADA,

courts have looked to see if there is evidence that the alcoholism establishes the impairment of a

major life activity. *Ladd v. Mohawk Carpet Distribution, L.P.*, 2010 WL 2541651, *10 (D.Minn.

2010)(ruling on actions in 2007 before the 2008 amendments to the ADA); *Oxford House, Inc. v.*

*Township of Cherry Hill*, 799 F.Supp. 450, 459-460 (D.N.J. 1992).

The Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") became

effective January 1, 2009. 42 U.S.C. 12101. The ADAAA made it substantially easier to

consider alcoholism as a disability. Among the provisions of the ADAAA that apply to

alcoholism, the ADAAA stated first that the definition of disability shall be construed in favor of

broad coverage to the maximum extent permitted. 42 U.S.C. 12102(4)(A). Second, the term

"substantially limits" shall be interpreted consistently with the findings and purposes of the

ADAAA, which purposes were to overrule previous decisions and make it much easier to find

that persons are disabled. 42 U.S.C. 12102(4)(B). "Substantially limits" no longer means

"significantly restricted" or "severely restricted." Senate Statement of Managers at 2, 6-8 &

n.14: 2008 House Committee on Educ. and Labor Report at 9-10. Third, an impairment that

substantially limits one major life activity need not limit other major life activities. 42 U.S.C.

12102( C). Fourth, the ADAAA stated that an impairment that is episodic or in remission is a

disability if it would substantially limit a major life activity when active. 42 U.S.C. 12102(4)(D).

Fifth, the ADAAA stated that the determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures, such as medication, technology, accommodations, and learned behavioral or adaptive neurological modifications. 42 U.S.C. 12102(4)(E).

Sixth, the ADAAA stated that discrimination for regarding someone as disabled no longer requires that the employer perceived the individual to be substantially limited in a major life activity. Instead, the amendment provided that an employee is regarded as disabled if he or she is subject to an action prohibited by the ADA, like denial of employment, based on an impairment that is not both transitory and minor. 42 U.S.C. 12102(3). Alcoholism is not transitory and minor. Rather, alcoholism is long-term and serious, but is may be eposodic or in remission, which is covered by the ADAAA. 42 U.S.C. 12102(4)(D).

Causing a person to lose employment because the person has the condition of alcoholism, is perceived to have alcoholism, or has a record of alcoholism is prohibited by law. *E.E.O.C. v. Old Dominion Freight Line, Inc.*, 2012 WL 1413309, *2-3 (W.D.Ark. 2012).

The Defendants freely admit that Plaintiff has alcoholism. The Defendants devote the first section of their Statements of Fact to "A. Plaintiff's Alcoholism." Def. Br. pp. 2-3. The Defendants' Statements of Facts show the long record of alcoholism of the Plaintiff, including years of drinking from age 18, through long years of heavy drinking, records of driving under the influence, records of alcoholism involved in his divorce, and records of alcoholism involved in his work. Def. Facts 1-46. The Defendants describe Plaintiff's divorce in which Plaintiff was required to purchase an alcohol breath sensor for his wife so that she could administer alcohol breath tests prior to Plaintiff receiving visitation with his kids. Def. Fact 7. The Defendants

16

describe the substantial limitation on Plaintiff from driving any vehicle in which any of his children were passengers. Def. Fact 8. The Defendants describe incidents between 2003 and 2008 in which the Defendants limited Plaintiff from working for periods while Plaintiff received treatment for alcohol abuse. Def. Facts 10-11, 24-33, 40-46. The Defendants end their Brief by stating that Plaintiff is "an admitted alcoholic with a long history of abuse and two prior DUIs." Def. Br. 25:16-17.

The Defendants admit that they knew of the records of alcoholism of Plaintiff and that they wrote letters and testified on behalf of Plaintiff as a good employee in his second DUI sentencing and in his divorce. Def. Facts 15-23. The Defendants also knew of his record of alcoholism and his hospital treatment programs for alcoholism. Def. Facts 10-11, 24-33, 40-46.

After Plaintiff told the Defendants that he quit, the Defendants got mad at Plaintiff and made false statements to his prospective employer, TMC. Mike Snider, acting for The Snider Group, Inc. told Plaintiff's prospective employer that Plaintiff was terminated, when he actually quit to work for TMC, that Plaintiff had refused an alcohol test, when he had not refused and had gone to every rehabilitation program that the Defendants requested, and that he had not completed the return-to-duty process, when he had completed the return-to-duty process and actually returned to work twice after completing rehabilitation programs.

Plaintiff's alcoholism substantially limited his major activities of caring for himself, caring for his family, drinking, walking, communicating, and working. Def. Facts 1-46; Knox Aff. 2-11. His alcoholism interfered with his work to such an extent that the Defendants told him that he had to leave work and go to rehabilitation programs. Def. Facts 24-33, 40-46. The Defendants provided accommodation to Plaintiff for his disability of alcoholism by granting him

17

leave, and allowing him to attend rehabilitation programs. Def. Facts 24-33, 40-46.

However, when Plaintiff told the Defendants that he was quitting and going to another job, the Defendants got mad at Plaintiff for leaving them after they had provided accommodations to him for his alcoholism. The Defendants stated that they terminated Plaintiff, instead of stating that Plaintiff quit, stated that he refused a test, when he never refused a test, and stated that he did not complete the return-to-duty process, when he always completed the return-to-duty process.

The Defendants cite a decision in which the only major life activity considered was working, and Plaintiff's alcoholism did not interfere with his working. *Brookins v. Indianapolis Power & Light Co.*, 90 F.Supp.2d 993, 1002 (S.D.Ind. 200). That plaintiff was not limited in his working like Jay Knox was. That plaintiff was not granted leave from work by the employer for his alcoholism, like Jay Knox was. That plaintiff did not have a long record of DUIs, divorce, limitations placed on him by courts, and limitations placed on him by his employer for alcoholism. That plaintiff also was not limited in his other major life activities.

The decisions and authorities cited by the Defendants are before the amendments to the ADA by the ADAAA. Again, the Defendants simply ignore facts, and in this case, the law. The decisions cited by the Defendants also involve only the consideration of limitations on the major life activity of working, not other major life activities in which Jay Knox has been substantially limited.

The amendments in the ADAAA changed the definition of disability. The amendments stated that the definition of disability shall be construed in favor of broad coverage to the maximum extent permitted by the terms of the chapter. 42 U.S.C. 12102(4)(A). The amendments

18

stated that an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active. 42 U.S.C. 12102(4)(B). The Defendants have described how Plaintiff's alcoholism is episodic or in remission, thus qualifying Plaintiff with a disability under the pre-amendment decisions and under the amends of the ADAAA. Def. Facts 1-11, 13-14, 24-33, 39-46.

The Defendants' argument that another company should not hire Plaintiff evidence the Defendants' animus to the Plaintiff because he quit after they gave him accommodations, and their stereotyping of Plaintiff that he should not work for someone else, because he has a "long history of abuse and two prior DUIs." Def. Br. 25:16-17. The Defendants provide the causal link to Plaintiff's disability for the Defendants' actions in making false statements about Plaintiff being terminated, instead of quitting, about him refusing a test when he did not refuse, and about him failing to complete a rehabilitation program when it is undisputed that he did complete a rehabilitation program. The Defendants got mad at Plaintiff and lied about him to his prospective employer because of his disability. The Defendants were mad at Plaintiff for leaving them to work for someone else after they had provided accommodations to him for his disability.

The amendments also state that the determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures, such as medication. Plaintiff's rehabilitation programs were medication. Plaintiff's last rehabilitation program was in August, 2008, just the year before he quit and the Defendants terminated him in August, 2009. The Defendants point out that Plaintiff has been prescribed Antabuse as a medication. Def. Fact. 27. Plaintiff's supervisor testified that Plaintiff was terminated for attendance and alcohol problems. Koch 61:20-68:24. Plaintiff's supervisor

19

testified that he observed Plaintiff not performing up to his capacity and not functioning

properly. Koch Dep. 81:15-82:19. The supervisor believed that Plaintiff was under the influence

of alcohol. *Id.* The supervisor reported to Mike Snyder that Plaintiff was not functioning

properly and wasn't performing up to his capacity. *Id.*

Furthermore, even if Plaintiff did not have a disability, the evidence is sufficient to show

that the Defendants regarded him as having a disability and not being able to work as a driver for

the prospective employer. *EEOC v. Old Dominion Freight Line, Inc.*, 2012 WL 1413309, *2-3

(W.D.Ark. 2012).

The same is true for the Defendants discriminating against Plaintiff because he had a

record of alcoholism. The Defendants continue to argue about all of the alcoholism problems that

Plaintiff had and the records of alcoholism that he had with the Defendants, with the State, and

in civil cases. The Defendants held those records of alcoholism against him even though he was

a good employee. The Defendants argue that he could not work for the prospective employer

because of his records of alcoholism. The Defendants' arguments about Plaintiff's records of

alcoholism provide evidence that the Defendants discriminated against him because of his

records of alcoholism and lied about him being terminated instead of quitting, lied about him

refusing a test, and lied about him not completing a rehabilitation program.

The prohibition against discrimination for regarding someone as disabled under the

ADAAA no longer requires that the employer perceived the individual to be substantially limited

in a major life activity. Instead, the amendment says that an employee is regarded as disabled if

he or she is subject to an action prohibited by the ADA, like denial of employment, based on an

impairment that is not transitory or minor. 42 U.S.C. 12102(3). Alcoholism is not transitory or

minor. Rather, alcoholism is long-term and serious, but it may be episodic or in remission, which is covered by the ADAAA. 42 U.S.C. 12102(4)(D).

> 2.   There is evidence that Plaintiff was meeting legitimate expectations.

The Defendants argue that Plaintiff was not meeting the Defendants' legitimate expectations, because he was absent for three days before he called the Defendants and quit on August 12, 2009. There is no evidence that being absent for three days was something for which the Defendants would have terminated the Plaintiff who had worked for them for many years. On the contrary, the evidence shows that the Defendants had previously told Plaintiff to go home and come back to work in three or four days. Knox Dep. 57:23-58:11. Plaintiff's supervisor testified that Plaintif fwas off two weeks for alcohol treatment. Koch Dep. 67:1-3. Also, the Defendants' termination of Plaintiff after he quit on August 12, 2009 stated that he had not worked from August 10, 2009 to August 15, 2009, which were supposed absences more than 3 days. Def. 2, Knox Dep. Ex. 15. Also, the letter of termination was not sent to Plaintiff until August 19, 2009. *Id.*

> 3.   There is evidence that Plaintiff suffered an adverse employment action.

The Defendants argue that Plaintiff was not terminated, because he quit on August 12, 2009. However, in spite of Plaintiff's resignation on August 12, 2009, the Defendants did terminate him on August 19, 2009. Termination of employment is the classic adverse employment action, and the defendants do not dispute that termination is an adverse action. Instead, the Defendants argue that failing to call in or report to work on five (5) consecutive days is a legitimate nondiscriminatory reason for a termination. Def. Br. p. 14:10-11. But, by the

Defendants' own Statements of Facts, Plaintiff did call in and report that he quit on August 12,

2009. Def. Stat. Fact 49; Knox Dep. 104-105. Furthermore, the Defendants' false statements to

plaintiff's prospective employer which denied him employment were adverse actions against

Plaintiff, and those are not argued by the Defendants not to be adverse actions.

### 4.    There is evidence of the different treatment of Plaintiff.

The Defendants argue that Plaintiff's supervisor, Augie Koch, cussed other employees as

well as Plaintiff. However, Mike Snider blamed Jay Knox for the harassment of Knox by Augie

Koch because of Jay Knox's "alcoholism." Snider Dep. 52:9-53:3, 68:9-70:23. Mr. Koch himself

testified that Jay Knox was terminated for attendance and alcohol problems. 61:20-68:17. Mr.

Koch testified that he observed Jay Knox not performing up to his capability and not functioning

properly because Koch believed that Knox was under the influence of alcohol. Koch Dep. 81:22-

82:8.

There is no evidence that the Defendants terminated anyone else after they quit.

Terminating someone after they quit is making false statements. The Defendants do not claim

that they terminated anyone else after they quit or that they backdated any other employee's

termination or that they said that anyone else refused a DOT regulated testing when the person

had not refused. The Defendants do not claim that they said that anyone else did not complete

the return-to-duty process when the employee had completed the return-to-duty process. The

Defendants treated Jay Knox worse than the other employees.

Furthermore, the law does not require similarly situated persons in order to prove

discrimination. *Miners v. Cargill Communications, Inc.*, 113 F.3d 820, 824 n. 7 (8th Cir. 1997)(if

similarly situated persons were required, employees without similarly-situated peers would be

without the protection of the ADA); *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802 n.

13(proof required to establish a prima facie case of discrimination will necessarily vary in

different factual situations); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)(court erred

in requiring plaintiff to plead facts in accordance with particular evidentiary standard under

ADEA and Title VII); *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-313

(the fact that plaintiff was replaced by someone outside the protected class is not a proper

element of *McDonnel Douglas*); *Bellaver v. Quanex Corp.*, 200 F.3d 485, 493-495 (7th Cir.

2000)(where a plaintiff's duties were absorbed by other  employees, the plaintiff need not show

someone similarly situated) *Riley v. Vilsack*, 665 F.Supp.2d 994, 1006-07 (W.D.Wis. 2009)(not

identifying similarly situated persons treated more favorably is not required, even at the

summary judgment stage). The Defendants in this case do not claim that anyone was hired to

replace Jay Knox, only that his duties were absorbed by the other employees. Where there is

other evidence of discrimination, treatment of similarly situated persons need not be proven.

*Leffel v. Valley Financial Svcs.*, 113 F.3d 787, 793 (7th Cir. 1997); *Carson v. Bethlehem Steel

Corp.*, 82 F.3d 157, 158-59 (7th Cir. 1996); *Echols v. Select Beverages, Inc.*, 64 F.Supp.2d 807,

812-13 (S.D.Ind. 1998).

C.   <u>There is evidence of a prima facie case of retaliation.</u>

The Defendants argue that Plaintiff's complaints were not related to his disability of

alcoholism, but the alcoholism was the main subject of concern between Plaintiff's complaints

and the Defendants. Def. Facts 1-56. The law provides that prohibited discrimination under the

ADA includes retaliation against an employee for requesting accommodation. *Sulima v.

Tobyhanna Army Depot*, 602 F.3d 177, 188 (3rd Cir. 2010).

23

Plaintiff had requested and been granted accommodations by the Defendants in the form of being granted leave, being allowed rehabilitation programs, and being moved away from Augie Koch. Snider Dep. 36:9-24; Knox Dep. 60:14. However, about six months after Knox's 2008 complaint, the Defendants moved Plaintiff back under the supervision of Augie Koch in 2009. Snider Dep. 53:1-13; Knox Dep. 53:19-61:10. Snider admitted that he believed that the cause of Knox's complaints was his alcoholism. Snider Dep. 49:23-53:13; Knox Dep. 64:6-67:3. The Defendants allowed Knox leave and rehabilitation programs as accommodations for his disability, so, the Defendants knew that Knox's complaints involved alcoholism. When Jay Knox complained about Augie Koch in 2008, Mike Snider suggested to Knox that he go to an alcohol rehabilitation program. Knox Dep. 57:23-59:19.

Jay Knox complained about his treatment by Augie Koch.  Jay Knox complained to Mike Snider about Augie Koch calling him derogatory names, such as "asshole" and "stupid" and interfering with Knox's work. Knox Dep. 55:8-19. Knox complained that he was being treated worse than other employees. *Id.* He complained that Koch was giving him more work when other employees were available to do the work. *Id.*

Augie Koch told Mike Snider that he thought that Jay Knox was not performing up to his capability and not functioning properly because Koch believed that Knox was under the influence of alcohol. Koch Dep. 81:22-82:8. Jay Knox told Mike Snider that he was sick of Koch's treatment of him and he was quitting if Snider was not going to get Knox off Koch's crew. Knox Dep. 49:3-51:10. Later, when Jay Knox quit in 2009 and the Defendants terminated Knox, Koch said that Knox was terminated for absenteeism and alcohol problems. Koch Dep 61:20-68:17. Jay Knox was complaining about being treated worse than other employees by

24

Augie Koch, and both Koch and Snider connected Knox's complaints to his alcohol problems. After Jay Knox complained about the worse treatment of him by his supervisor related to his alcohol problems and he got another job, the Defendants terminated Jay Knox after he quit, and the Defendants lied about him being terminated, refusing a test, and failing to complete the return-to-duty process. Mr. Koch himself testified that Jay Knox was terminated for attendance and alcohol problems. Koch Dep. 61:20-68:17.

The questions on the TMC form related to Jay Knox's disability of alcoholism. Mike Snider answered the TMC form by stating that Jay Knox had refused to be tested for a DOT regulated testing. Mike Snider made the false statements on the TMC form because Jay Knox requested the accommodations of quitting, keeping Augie Koch away from him, and being given leave from work and a rehabilitation program for alcoholism. Knox Dep. 56:15-25. Jay Knox did not refuse a DOT regulated testing. He complained about Augie Koch and requested accommodations. Because he complained about Augie Koch and requested accommodations for his disability, the Defendants retaliated against him and falsely stated that he refused a DOT regulated testing, stated that he did not complete the return-to-duty process, and stated that he was terminated for attendance, none of which was true.

D.    There is a cause of action for keeping Plaintiff's medical records in his personnel file.

The Defendants cite cases in which the Plaintiff suffered no injury. Plaintiff's case is much different. Plaintiff suffered the injuries of the employees of the Defendants being reminded of his alcoholism every time they opened his personnel file, resulting in the Defendants getting mad at Plaintiff when he quit after they had sent him to rehabilitation and making false statements about him with regard to those records of alcoholism. The failure to maintain

Plaintiff's medical records separately from his personnel records resulted in Plaintiff's disability not being kept confidential, but rather, being at the forefront of everyone's mind. It resulted in Plaintiff losing employment opportunities because of the false statements of the Defendants. Koch testified that Plaintiff was terminated because of his attendance and alcohol problems. Koch Dep. Koch Dep. 61:20-68:17. This is not a case in which there was no injury.

        E.     <u>Plaintiff's claim for defamation does not fail as a matter of law.</u>

The Defendants claim that Mike Snider's statements to TMC Transportation were true and accurate statements. The Defendants' statement is false. It is disputed that Mike Snider's statements to TMC Transportation were true and accurate. First, Plaintiff quit, he was not terminated, other than being defamed by Mike Snider after he quit. Def. Fact 49, Def. Ex. 2, Snider Dep. Ex. 15. Second, Plaintiff did not refuse a drug or alcohol test. Knox Dep. 54:15-63:22. In fact, Plaintiff went to rehabilitation as requested by Mike Snider. *Id.* Third, Plaintiff successfully completed the rehabilitation program, contrary to Snider's statement to TMC. *Id.* Mike Snider even admitted that his statement that Knox did not complete the return-to-duty process was not a true statement by him. Snider Dep. 90:15-94:11. Snider tried to testify that he misread the question, but he admitted that his statement was not true. *Id.* Snider testified that he took the question to mean a return-to-duty process that the Defendants do not have. *Id.* However, if the Defendants did ask Knox to go to a rehabilitation program before he was allowed to return to duty, he did go to a rehabilitation program, and the Defendants did allow him to return to duty. So the facts were clear that whatever process the Defendants had for returning to duty, Knox completed the process. In spite and with malice against Knox after Knox quit on him, Mike Snider lied about Knox not completing the return-to-duty process.

The evidence that Mike Snider maliciously terminated Plaintiff after Plaintiff quit is evidence of the Defendants' malice and not good faith. The evidence that Mike Snider maliciously told a prospective employer that Plaintiff was terminated, instead of quitting is evidence of the Defendants' malice. The evidence that Mike Snider maliciously told a prospective employer that Plaintiff refused a drug and alcohol test when Plaintiff did not refuse and when he even completed an rehabilitation program is evidence of the Defendants' malice. The evidence that Mike Snider told the prospective employer that Plaintiff did not compete a return-to-work process, when he not only completed the process, but actually returned to work, is evidence of the Defendants' malice. The Defendants' failure to take any action to correct the false statements and to continue to claim that Plaintiff should not be employed by the prospective employer is evidence of the Defendants' malice.

After stating that Plaintiff refused a DOT regulated test, Mike Snider could not say that Plaintiff had refused a test, but had completed a return-to-duty process. Snider's lies would not have made sense. So, Snider was caught in the trap that he had to keep lying. The prospective employer would see that Snider's statement that Plaintiff refused a drug and alcohol test was not true if Snider said that Plaintiff completed a return-to-duty process. Also, the prospective employer might have hired Plaintiff if Snider had stated that Plaintiff refused a test, but completed the return-to-duty process. Snider made the false statements to make sure that Plaintiff was injured and would not obtain the prospective employment after quitting on Snider. Snider was malicious and made all of the false statements to prevent Plaintiff from obtaining employment.

The Defendants also argue that there was no damage, because TMC Transportation

would not have hired Plaintiff because "Plaintiff, an admitted alcoholic with a long history of abuse and two prior DUIs, was not qualified for the position of over the road truck driver with TMC." Def. Br. 25:16-17. The facts are clearly disputed. TMC Transportation told Plaintiff that he would be hired and that TMC would obtain an employment verification from The Snider Group. Knox Dep. 74-77. Knox disclosed to TMC that he had two prior DUIs, but it was not a problem, because TMC was going to check his driving record, and DUIs more than ten years ago would not be on his driving record. *Id.* The Defendants do not assume that TMC would follow the ADA and not hold old convictions against Plaintiff. On the contrary, the Defendants' position shows that the Defendants are the ones who are arguing that Knox should be stereotyped and discriminated against because of his disability, his perceived disability, and his old records of alcoholism.

## IV.   CONCLUSION

For all of the above reasons, the Defendants' Motion For Summary Judgment must be denied.

Respectfully submitted,

s/ Richard L. Darst
Richard L. Darst
Cohen Garelick & Glazier
8888 Keystone Crossing Boulevard
Suite 800
Indianapolis, Indiana  46240-4636
Telephone (317) 573-8888
Facsimile  (317) 574-3855
Email rdarst@cgglawfirm.com
Attorneys for Plaintiff

28

Certificate of Service

I certify that a copy of the foregoing was filed electronically on the 14th day of August,

2012. Notice of this filing will be sent to the following by operation of the Court's electronic filing

system. Parties may access this filing through the Court's system.

Dane A. Mize
Skiles DeTrude
150 East Market Street, Suite 200
Indianapolis, IN 46204
dmize@skilesdetrude.com


s/ Richard L. Darst_____